IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>vs.<br><br>JULIAN REYES FERRER-<br>HERNANDEZ,<br><br>   Defendant. | No. CR12-2012<br><br>ORDER REGARDING<br>COMPETENCY |

TABLE OF CONTENTS

I.   INTRODUCTION .................................... 2

II.  PROCEDURAL HISTORY ............................. 2

III. RELEVANT FACTS .................................. 2
     A.   The Charges ................................. 2
     B.   Defendant's Background ...................... 3
     C.   Evaluations ................................. 5
          1.   Luis Rosell, Psy.D. .................... 5
          2.   Christine Scronce, Ph.D. ............... 5

IV.  DISCUSSION ...................................... 7
     A.   Is Defendant Able to Understand the Nature
          and Consequences of the Proceedings Against Him? ........ 8
     B.   Is Defendant Able to Assist Properly in His Defense? .... 11

V.   ORDER .......................................... 12

## I. INTRODUCTION

On the 12th day of February 2013, this matter came on for hearing to determine Defendant's competency to stand trial. The Government was represented by Assistant United States Attorney Daniel C. Tvedt. Defendant Julian Reyes Ferrer-Hernandez appeared personally and was represented by attorney JoAnne Lilledahl.

## II. PROCEDURAL HISTORY

On May 17, 2012, Defendant was charged by Indictment with unauthorized use of a social security account number (Count 1), unlawful use and possession of identity documents (Count 2), making a false material representation (Counts 3 and 5), and making a false claim to United States citizenship (Count 4). At his arraignment on May 22, Defendant entered a plea of not guilty, and trial was scheduled for July 23. Defendant was ordered detained pending the trial.

On June 25, Defendant was examined in jail, at his attorney's request, by Luis Rosell, Psy.D. Following the examination, Defendant's counsel filed a motion for a judicial determination of competency. The Government did not resist the motion, and asked that Defendant be evaluated at a Bureau of Prisons facility. The Court ordered Defendant committed for that purpose, and continued the trial to November 19.

Defendant was transported to MCC-Chicago for purposes of an evaluation. Due to the time required to transport Defendant, complete the evaluation, and return Defendant to this district, the trial was continued several times and is now scheduled for April 1, 2013. A status conference is scheduled on March 6, 2013.

## III. RELEVANT FACTS

### A. The Charges

Counts 1, 2, and 3 allege that on May 19, 2008, Defendant possessed a social security card and permanent resident card which he knew to be counterfeit, and that he falsely represented the social security account number as belonging to him. It is further alleged that he falsely claimed on an Immigration Form I-9 that he was a lawful permanent

resident. Counts 4 and 5 arise from events on April 16, 2012. On that date, Defendant allegedly told an ICE agent that he had not been employed in the United States since 2005, when in fact he had been employed continuously between May 2008 and February 2012. Defendant also claimed he was born in Texas, and falsely claimed he was a United States citizen.

### B. Defendant's Background

The only information the Court has regarding Defendant's background is contained in the Competency Evaluation (Defendant's Exhibit B) of Dr. Rosell, and the Forensic Report (Government's Exhibit 1) by Christine Scronce, Ph.D. As noted by Dr. Rosell, obtaining Defendant's history "was rather difficult as he contradicted himself through the interview and denied many of the statements he had made previously about his history that were in the records."[1] Dr. Scronce also noted that Defendant "provided inconsistent information across interviews" and because there was very little "collateral information" about Defendant, determining his true history is difficult.[2]

Defendant apparently told investigators he was born in El Salvador and raised by his parents with eight siblings. He later recanted, however, and told Dr. Rosell he was born in Texas, never knew his father, and his mother's name was Quintero. Defendant initially told Rosell he went to school in El Salvador until age 15, but later said he only visited there a few times. When interviewed by Dr. Scronce, Defendant claimed he was born in Idaho. After discussing a birth certificate for Richard Casares, indicating San Antonio, Texas, as the place of birth, Defendant told Scronce he was born in "Idaho, Texas." Defendant told Scronce he was raised by his mother, had never met his father, and had no siblings. He said he grew up in California and Central America, and was educated in El Salvador, finishing high school there.

---

[1] Dr. Rosell's Competency Evaluation (Defendant's Exhibit B) at 1.

[2] Dr. Scronce's Forensic Report (Government's Exhibit 1) at 2.

3

In talking to Dr. Rosell, Defendant claimed to be Richard Elias Caseres from North Hollywood, California. Rosell noted, however, that the physical description of Caseres differed from Defendant by over five inches and fifty pounds, with different birth dates. Defendant also told Dr. Scronce that his name was Richard Elias Caseres, although he spelled the last name at least three different ways. Defendant told Scronce during one interview that his date of birth was March 24, 1987, but in a later interview said March 22, 1987. The Bureau of Prisons lists his birth date as November 1, 1985, and the birth certificate for Richard Casares has a date of birth of July 27, 1987.

Defendant told Dr. Rosell he had never worked in the United States. However, several employees at "Precise Concrete" identified him as a co-worker for several years. According to Dr. Scronce's report, a human resources representative at "Premiere Casting" reportedly identified Defendant as having worked at that facility from May 20, 2008 until February 22, 2012. Defendant told Scronce that he owned his residence and "lived off his savings."

Defendant's only criminal history apparently consists of a public intoxication conviction in Waterloo, Iowa. Defendant was arrested on March 14, 2012. According to Dr. Scronce, "[t]he police report described him as shirtless, unsteady on his feet, and smelling of alcohol."[3] When police took him to his residence to check his identification, he produced four different IDs, as well as a permanent resident card and a social security card. Two of the ID cards were from El Salvador and bore the name Julian Hernandez-M, and two of the IDs were from California and had the names Richard Elias Cas<u>a</u>res and Richard Elias Cas<u>e</u>res. The latter two cards listed Casares' height and weight as 5 feet 7 inches and 180 pounds, while Defendant is actually 5 feet 3 inches and 133 pounds.

---

[3] *Id.* at 3.

## C. Evaluations

### 1. Luis Rosell, Psy.D.

On June 25, 2012, Luis Rosell, Psy.D. evaluated Defendant at the Linn County Jail in Cedar Rapids, Iowa. The 2½-hour evaluation was conducted in Spanish. In addition to the interview, Dr. Rosell administered the Miller Functional Assessment of Symptoms Test (M-FAST), the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) (Spanish version), and the Evaluation of Competency to Stand Trial-Revised (ECST-R).

The M-FAST is designed to test psychiatric malingering. Defendant denied experiencing any symptoms, however, and therefore was not malingering any psychiatric condition. Because Defendant answered the great majority of the items on the MMPI-2 as false, the test was not valid and did not allow any interpretation of a clinical profile. According to Dr. Rosell, the ECST-R revealed Defendant has a "moderate understanding" of the roles of the judge, jury, and his attorney. He was not aware, however, that another attorney represents the government, because he believed that was the job of the police.

Dr. Rosell concluded that "[t]his is a difficult situation with an individual who appears to believe he may actually be someone else."[4] According to Rosell, Defendant "may have a delusional disorder" that causes him to deny many facts that are "clearly evident," such as the physical discrepancies between himself and Elias-Caseras, and his employment in Waterloo. Accordingly, Rosell opines that Defendant "is unable to assist his attorney in his own defense."[5]

### 2. Christine Scronce, Ph.D.

Defendant was transported to the Metropolitan Correctional Center in Chicago, Illinois, for an evaluation of his competence to stand trial and his sanity at the time of the alleged offenses. The evaluation was conducted by Christine A. Scronce, Ph.D.

---

[4] Dr. Rosell's Competency Evaluation (Defendant's Exhibit B) at 3.

[5] *Id.*

According to her curriculum vitae (Government's Exhibit 2), Scronce earned a Ph.D. in clinical psychology in 1993, and has been employed by the Bureau of Prisons since that time. She has worked as a forensic psychologist for more than 15 years and has conducted approximately 725 competency evaluations.

Defendant arrived at MCC-Chicago on August 20, 2012.[6] While there, he met approximately eight times with Dr. Scronce and a Ph.D. student working under her direction. Scronce testified that her interviews with Defendant lasted approximately 3½ hours, with an additional 3½ hours of psychological testing. Defendant was housed on the same unit where Scronce has her office and, therefore, she occasionally observed his interactions with other residents.

According to Dr. Scronce's report, Defendant denied any mood or psychotic symptoms, or "any sort of paranoid ideas." Scronce described Defendant's affect as "appropriate," and reported that he smiled and joked on occasion. Scronce's report also states that Defendant's "hygiene and grooming were good," but she admitted while testifying at the hearing that at one testing session he appeared "fatigued and disheveled." Scronce speculated that he may have just gotten up and had not yet showered.

According to Dr. Scronce, Defendant seemed "fairly disengaged" during interviews and testing. For example, when he was administered the Spanish version of the MMPI-2, he completed the 567-item test in about 55 minutes. Scronce acknowledged, however, that the test requires a 5th or 6th grade reading level, and she has no information regarding Defendant's ability to read at that level. When Scronce confronted Defendant regarding his lack of effort, "he adamantly and repeatedly insisted that he had read every item and had not responded randomly."[7] Defendant agreed to retake the test using an audio tape. While the results showed "moderate inconsistency," the test was considered valid. The

---

[6] While the record is imprecise, Defendant apparently remained there until sometime in November.

[7] Dr. Scronce's Forensic Report (Government's Exhibit 1) at 5.

6

results reflected "an unsophisticated attempt to present oneself in an unusually favorable light," which Scronce testified was not uncommon under these circumstances. The clinical profile was consistent with a person experiencing "mild emotional distress, characterized by tension, worry, and anxiety."[8]

Defendant was also administered a Test of Nonverbal Intelligence-Third Edition (TONI-3). Because it does not require English language skills, it is considered a relatively "culture-free" measure of intellectual functioning. A subject is provided with puzzles and is then required to complete the puzzle. Defendant's test results, if valid, would place him at less than the first percentile rank of scores. The student who administered the test noted that Defendant responded quickly to the test questions, however, and Dr. Scronce opined that he had not put forth much effort.

Because it appeared Defendant was not putting forth his full effort on tests, he was given the nonverbal portion of the Validity Indicator Profile (VIP), which is used to help distinguish between valid and invalid response styles on cognitive testing. Defendant responded randomly to the test items, supporting the conclusion that he was not motivated to perform well on testing.[9] Accordingly, Dr. Scronce concluded that the TONI-3 "most likely underestimated his true level of functioning."[10]

## IV. DISCUSSION

A defendant is not competent to stand trial if the court finds by a preponderance of the evidence that "the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(d); *See also United States v. Ghane*, 593 F.3d 775, 779 (8th Cir. 2010).

---

[8] *Id.* at 6.

[9] *Id.* at 7.

[10] *Id.*

Accordingly, the test for competency has two prongs: "(1) whether 'the defendant has a rational as well as factual understanding of the proceedings against him,' and (2) whether the defendant 'is able to consult with his lawyer with a reasonable degree of rational understanding.'" *Id.* at 780 (quoting *United States v. Denton*, 434 F.3d 1104, 1112 (8th Cir. 2006)); *See also Dusky v. United States*, 362 U.S. 402 (1960).

Which party bears the burden of proof in this regard has not been firmly established. In *United States v. Whittington*, 586 F.3d 613 (8th Cir. 2009), the Court noted a circuit split on this issue. The Fourth and Tenth Circuits place the burden of proof on the defendant to prove incompetence, while the Third, Fifth, Seventh, and Ninth Circuits place the burden of proof on the Government to prove competence. *Id.* at 617. The Eleventh Circuit has taken the position that the burden falls on the party making the motion to determine competency, and the Second Circuit has declined to reach the issue, noting that "the allocation of the burden of proof to the defendant will affect competency determinations only in a narrow class of cases where the evidence is in equipoise." *Id.* at 618. While noting that "[t]he guidance of the Supreme Court, and the recent precedent of this circuit, support the government's position that the burden is on the defendant to prove incompetence by a preponderance of the evidence," the Court in *Whittington* concluded that it "need not address the burden of proof issue further because we conclude the district court's finding of competency in this case did not depend upon the allocation of the burden of proof." *Id.*

### A. Is Defendant Able to Understand the Nature and Consequences of the Proceedings Against Him?

First, the Court must determine if Defendant suffers from a "mental disease or defect" that prevents him from understanding the nature and consequences of the proceedings. This requires "a rational as well as factual understanding" of the proceedings. *Ghane*, 593 F.3d at 780.

Neither Dr, Rosell nor Dr. Scronce observed Defendant showing any symptoms consistent with a mental illness, and Defendant did not claim any such symptoms. Nonetheless, Dr. Rosell concluded that because of Defendant's persistent assertions that he was Richard Casares, he "may have a delusional disorder." In her report, Dr. Scronce directly and effectively rebutted that conclusion.

> Dr. Rosell suggested that the defendant may have Delusional Disorder because the defendant has insisted, despite overwhelming evidence to the contrary, that he is not Julian Ferrer-Hernandez, and that his name is really Richard Elias Casares and he is a U.S. citizen. In other words, Dr. Rosell posits that the defendant has a severe mental illness that causes him to sincerely believe that he is Richard Elias Casares. However, this supposition is not consistent with the facts of the case. Mr. Ferrer-Hernandez is accused of having a false Social Security card and Permanent Resident card under the name Julian Ferrer-Hernandez. He is accused of using these documents to falsify his employment application at Premier Casting, where he reportedly worked under the name Julian Ferrer-Hernandez for four years. If he had the delusional belief that he was a different person who was a U.S. citizen (which would be a very unusual type of delusion), there would be no discernible reason for him to live and work under a different identity, that of a non-U.S. citizen, for several years. Further, when he was initially questioned by investigators, the defendant wrote down his true name, Julian Ferrer-Hernandez, and only claimed to be Richard Casares when he was told that investigators had discovered that his Social Security card and Permanent Resident card were forgeries. His dogged insistence that he is a different person who is a U.S. citizen does not appear bizarre in the context of his legal situation; it is clearly self-serving and evidently, Mr. Ferrer-Hernandez believes it is his only defense.

Dr. Scronce's Forensic Report (Government's Exhibit 1) at 7.

For the reasons stated by Dr. Scronce, the Court rejects Dr. Rosell's speculation that Defendant "may" be suffering from a delusional disorder. Instead, it appears he is

attempting to avoid the consequences of his criminal actions by doggedly coming up with multiple — albeit transparent — explanations for the various incriminating documents.

Defendant clearly has a factual understanding of the charges against him. When asked about his understanding of the federal charges, Defendant told Dr. Scronce he was charged with "false information." Defendant "indicated he was aware the charges arose from the allegations that he used false information."[11] When confronted with the fraudulent documents, Defendant changed his story numerous times — often during the same interview — in an attempt to avoid culpability. The Court concludes Defendant has a factual understanding of the charges against him.

The Court also believes Defendant has a rational understanding of the proceedings. While Defendant persistently denies facts which would seem to be easily proved, that does not mean he lacks a rational understanding of the proceedings. Defendant could simply be adopting the unsophisticated defense of "deny, deny, deny." Dr. Scronce reported that when confronted with the facts and his repeated inconsistencies, Defendant "laughed, squirmed, and looked chagrined, but he tried to explain away the discrepancies or change his answers."[12] Scronce testified that if Defendant held a "sincere belief" that he was Richard Casares, then he "wouldn't have any reason to look embarrassed or ashamed or chagrined."

The Court has not disregarded the possibility that Defendant has limited cognitive ability. The extent of Defendant's formal education is unknown, and his failure to exert any effort in testing prohibited an analysis in that regard. Apparently, however, Defendant has a general understanding of the legal process, and it appears that he successfully maintained employment for more than four years. There is no proof that Defendant's

---

[11] *Id.* at 9.

[12] *Id.* at 6.

cognitive ability would prevent him from understanding the nature and consequences of the proceedings.

### B. Is Defendant Able to Assist Properly in His Defense?

The second prong of the competency test requires a finding that because of a mental disease or defect, Defendant is unable to assist properly in his defense. Stated otherwise, he must be able to consult with his lawyer "with a reasonable degree of rational understanding." *Ghane*, 593 F.3d at 780.

Apart from his insistence that he is not Julian Reyes Ferrer-Hernandez, there is no evidence Defendant is suffering from a mental disease or defect, and no reason why he cannot assist properly in his defense. Defendant was apparently able to communicate without difficulty when being interviewed by Dr. Rosell and Dr. Scronce. In concluding Defendant does not appear able to assist in his defense, Rosell cited Defendant's "disagreements with his attorney, combative style, contradictory statements, and unchanging opinion when presented with evidence."[13] As noted by Scronce, however, "[a]lthough he may be *unwilling* to follow his attorney's advice, there is no indication that he is *unable* to collaborate with counsel in preparing a defense."[14]

In summary, simply denying the facts in the face of contradictory evidence does not make one delusional. Instead, it may simply represent a defendant's unsophisticated effort to avoid the consequences of his actions. For the reasons set forth above, the Court adopts the conclusion reached by Dr. Scronce and concludes that Defendant is competent to stand trial.[15]

---

[13] Dr. Rosell's Competency Evaluation (Defendant's Exhibit B) at 2.

[14] Dr. Scronce's Forensic Report (Government's Exhibit 1) at 10.

[15] The Court reaches this conclusion regardless of whether the burden of proof is on Defendant to prove incompetence, or on the Government to prove competence. Accordingly, like the Court in *Whittington*, I find it unnecessary to definitely allocate the
(continued...)

## V. ORDER

IT IS THEREFORE ORDERED that Defendant is hereby found **COMPETENT** to stand trial.

DATED this 15th day of February, 2013.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA

---

[15](...continued)
burden of proof.